### ELDRIDGE et al. v. FORT WORTH TRANSIT CO. et al.

No. 13985.

Court of Civil Appeals of Texas. Fort Worth.

Jan. 19, 1940.

Rehearing Denied Feb. 23, 1940.

Touchstone, Wight, Gormley, Strasburger & Price and R. B. Holland, all of Dallas, for appellants.

Cantey, Hanger, McMahon, McKnight & Johnson, Gillis A. Johnson, R. K. Hanger, and Warren Scarborough, all of Fort Worth, for appellees.

BROWN, Justice.

For many years prior to 1938 appellee, Fort Worth Transit Company, has been incorporated as a public carrier, operating street cars for the transportation of passengers for hire, within the limits of the City of Fort Worth and its suburbs, and has enjoyed these privileges under and by virtue of a franchise given to it by the proper authorities of said City, and such franchise is still in existence and has years yet to run.

Because of changed conditions, brought about by the increased ownership of private automobiles, and a resultant loss by street car companies, the Texas Legislature, in the year 1923, enacted what is now known as Article 6548, Revised Civil Statutes, by and through which persons operating street car companies, with the consent of a City in which such company may be operating, may meet the transportation needs of such City by operating motor buses or trackless vehicles in connection with the then operated street railway systems.

The City of Fort Worth expressly gave its consent to such change to said appellee, through the passage of its ordinance No. 1125, and appellee made a number of changes in its service, by virtue of the right thus given. All of which changes were ratified by the City.

In the year 1933, the Texas Legislature amended said Article 6548, Vernon's Ann.

Civ.St. art. 6548, so as to provide that public service corporations—such as appellee —might, with the consent of the governing body of a City, substitute for its street railways motor buses in whole or in part, and in harmony with such amended statute, the governing body of the said City of Fort Worth enacted its Ordinance No. 2012, expressly giving its consent to appellee to make such substitutions and to operate an all motor bus service in said City.

Early in August, 1937, the then Council of the City of Fort Worth (said City being what is known as a Home Rule City, operating under a charter adopted by the inhabitants of such City at an election held for such purpose) called a hearing, reciting that it was for the purpose of determining whether or not public convenience and necessity required the granting of a privilege for the furnishing of additional transportation service within the City of Fort Worth.

After such hearing (as was had) the minutes of the Council disclose that the following action was taken by such body (on August 9th, 1937): "After a full and complete discussion, City Councilman Hull moved that the City Council determine that there was a necessity and convenience in the City of Fort Worth for a 5¢ bus service. This motion was seconded by Councilman Martin and was adopted by the following votes: Aye, Mayor Hammond, Councilmen Eagle, Harrell, Elder, Hooper, Hull, Burton, Rumph and Seaman. Nay, none."

No other hearing was had on the matter and certain ordinances followed such vote, but same were never put into effect: Nos. 1998 and 2001.

On July 13th, 1938, almost a year following the passage of the "motion" above quoted, the City Council, without any further hearing or evidence, passed its Ordinance No. 2002, which is as follows:

"Ordinance No. 2002.

"An Ordinance Amending Ordinance No. 2001; Granting a Privilege, Right and Franchise for the operation of Motor Buses or Omnibuses upon the streets of the City of Fort Worth, Texas, to Joseph Eldridge and C. E. Mitchell, hereinafter to be incorporated and known as The Fort Worth Bus Company; and providing the Rates to be charged and the Terms and Conditions under which such buses are to be operated; and providing Conditions of Forfeiture.

"Whereas, under the provisions of Section 5, Chapter 27, of the Charter of the City of Fort Worth, and after a hearing duly and regularly held, the City Council finds that a necessity and convenience exists for the granting of a privilege to some reliable person, firm or corporation to operate motor buses for hire on the streets of the City of Fort Worth at rates not to exceed five cents (5¢) for adult persons and half-fare for children of twelve (12) years or less; and,

"Whereas, proposals have been submitted by reliable persons and firms for such privilege, right and franchise to operate motor buses on the public streets of said city, and they have agreed in consideration of such grant that they will operate such motor buses on the streets and thoroughfares of said city upon each of the terms and conditions hereinafter set out, all of which are agreed to by them, with full knowledge that the City of Fort Worth cannot under the constitution and laws of the State of Texas, grant to them an exclusive franchise and cannot under the law waive or surrender its power to reduce rates; now, therefore,

"Be it Ordained by the City Council of the City of Fort Worth, Texas;

"That Ordinance No. 2001 be and the same is hereby amended to hereafter read as follows:

"Section 1. That in consideration of the acceptance by Joseph Eldridge and C. E. Mitchell of the terms and conditions hereinafter set forth and their agreement to abide by and conform to all the provisions, conditions, terms, requirements and limitations hereof, a privilege, right and franchise is hereby granted to the said Joseph Eldridge and C. E. Mitchell and their successors and assigns, to maintain and operate in, upon, along and across the public streets and thoroughfares of said City, as more particularly hereafter described, motor buses for the accommodation and transportation of passengers for hire and in connection therewith to make all necessary or convenient stops for the receiving and discharging of passengers at such places as may be reasonable or may be designated from time to time by the City Council. The said City Council agrees to zone off and designate bus zones for the safe loading and unloading of passengers and to pass an ordinance creating such zones and to strictly enforce same.

"Section 2. The said Joseph Eldridge and C. E. Mitchell, by the acceptance of the terms and conditions of this ordinance, agree that they will during the term of this privilege, right and franchise operate motor buses along the streets and thoroughfares, designated as herein elsewhere shown, unless permission to change such routes is granted by the City Council. It is further agreed that the said buses will be operated upon a schedule calling for at least one bus each way at least every fifteen minutes during the hours from six o'clock in the morning until eleven o'clock at night; unless permission to change said schedule is granted by the City Council; off-schedule cars to be operated at midnight and five o'clock A. M.

"Section 3. The term of this privilege, right and franchise shall be twenty-five (25) years from and after its effective date.

"Section 4. In addition to the above, the following terms, provisions, conditions and agreements must be and are consented to herewith and agreed to by Joseph Eldridge and C. E. Mitchell as the consideration which they give for the grant of the franchise and privilege to them:

"(a) The fare to be charged for transportation of passengers on said buses shall not exceed five cents (5¢) for each adult passenger and half-fare for children twelve (12) years of age and less. Children under five (5) years of age not occupying seats shall be carried free. For such fare, each passenger shall be entitled to one continuous trip in one general direction along the grantees' usual route or routes from any point therein, either by direct routes or by means of a transfer to and including any point within the City of Fort Worth, Texas.

"(b) The grantees shall furnish free transportation for all employees of the Police Department of the City of Fort Worth, Texas, either in uniform or not, all of which shall be regularly employed and are on the pay roll of the City of Fort Worth, Texas; all members of the Fire Department shall be furnished free transportation to and from their stations where regularly employed.

"(c) Grantees agree that they will pay to their employees the following wage scale for the first two years, and not less than the amounts shown opposite the classes named:

"Operators, Beginners, 46¢ per hour,

"Operators, after one year, 50¢ per hour,

"Skilled Labor, 50¢ per hour,

"Semi-Skilled Labor, 43¢ per hour,

"Common Labor, 32¢ per hour.

"(d) Grantees agree to maintain a general office in the City of Fort Worth and maintain adequate repair shops and storage barns within the corporate limits of the City of Fort Worth.

"(e) The accounts of the company shall be kept in accordance with a nationally recognized system of accounts separate from any other operations of the company. Said Company shall file with the Utilities Engineer of the City of Fort Worth a quarterly statement showing a balance sheet, operating statement, a detailed statement of additions and retirements, and a statement showing passengers carried and bus miles operated.

"(f) It is contemplated and agreed that this privilege, right and franchise may be transferred and assigned to a corporation duly incorporated under the laws of the State of Texas as an operating company separate and distinct and in no way affiliated with any other corporation or holding companies, and no further transfers or assignments shall be made without the written consent of the City Council.

"(g) The grantees shall at all times carry liability insurance for the protection of their passengers and for the protection of the public. The minimum amount of such insurance in force at all times shall be the sum of $5000, to cover damages to property, the sum of $10,000 to cover injury to any one person, and the sum of $20,000 to cover injuries to one or more persons in any one accident.

"(h) During the term of this privilege, right and franchise the grantees, their successors and assigns, will pay to the City of Fort Worth annually an amount equal to two per cent of the gross income realized from the operation of such buses, and the City of Fort Worth shall have access to all books and records of the company, at reasonable times, for the purpose of ascertaining the amounts due as provided for herein. Said two per cent gross receipts tax is to be paid in lieu of easement and all other ad valorem assessments or license taxes for the use of said streets, and shall be paid in addition to ad valorem taxes levied and assessed against the physical property of grantees.

"(i) This franchise, right and privilege is granted upon the further condition that the City of Fort Worth shall have the right to purchase the property operated hereunder at any time after ten years subsequent to its date hereof at the actual replacement value of said property, less depreciation, the replacement value to be determined in case of disagreement between the city and the owner of the property by arbitration as provided by the statutes of the State of Texas.

"Section 5. Nothing herein shall restrict the right or power of the city to adopt and enforce suitable regulations or ordinances, or otherwise, governing the qualifications of drivers, the brakes and the lights on the buses, and any other measure which it may deem necessary or advisable for the safety, comfort and convenience of the passengers and of the public. The City of Fort Worth agrees to pass and enforce ordinances regulating other motor vehicles for hire of all nature and description, prohibiting such vehicles for hire from cruising routes over and upon which motor buses of Joseph Eldridge and C. E. Mitchell operate, and further providing that all other companies engaging in the business of handling mass transportation shall be subject to the same regulations as imposed upon the grantees under this section. In the event such regulations as are provided in this section are not imposed upon other operating companies, then grantees, after due hearing, shall be relieved of compliance with such regulations.

"Section 6. The grantees shall begin operations upon all routes hereinafter set forth and shown in the diagram hereto attached marked Exhibit 'A', as soon as practicable after the effective date of the ordinance and in no event more than one hundred fifty (150) days after such date, and failure to do so shall be deemed and considered an abandonment of the rights herein granted, in which event the City Council may, at its discretion, upon thirty (30) days' written notice to the grantees herein, declare the privilege, right and franchise forfeited, and the grantees shall promptly remove their equipment from the streets and thoroughfares; and further conditioned that the grantees shall as soon as practicable thereafter, and in no event more than two hundred days (200) from and after the date of the commencement of operation of buses on routes as shown in Exhibit 'A', begin operations upon all

960

routes as shown in the diagram hereto attached and marked Exhibit 'B'. In the event any delay in the manufacture and delivery of the equipment should result from strikes, floods or acts of God, or in the event operations are prevented by court proceedings, grantees will be granted an extension of time until such conditions are relieved, become normal and cease to exist.

"Section 7. It is hereby stipulated and understood that the grantees shall in no event be relieved from their obligation on any of the routes designated in Exhibit 'B' as hereinbefore provided unless it is shown to the City Council that service is rendered on any of such routes in all respects similar to that proposed to be rendered by grantees at the same rates provided for in this ordinance; otherwise, service must be rendered by the grantees on each and all of said routes strictly under the terms, provisions and limitations herein provided.

"Section 8. It is agreed and expressly understood by all parties affected by this ordinance that in the event the grantees or their successors or assigns should attempt to increase any of the rates stipulated in this ordinance, all rights and privileges herein granted shall in the discretion of the City Council, upon fifteen (15) days' written notice be forfeited, and the grantees shall immediately remove all of their equipment from the streets and cease all further operations.

"Section 9. It is understood and agreed that the rights and privileges hereby granted are subject to the existing charter and ordinances of the City of Fort Worth and the laws and constitution of the State of Texas.

"Section 10. The grantees agree that within sixty (60) days after the acceptance of the above franchise, privilege and right they will execute and deliver to grantor a good and sufficient performance bond, signed by a reliable surety company, in the principal sum of Twenty-five Thousand Dollars ($25,000.00) or in lieu of such surety bond will deposit with the City of Fort Worth Twenty-five Thousand Dollars ($25,000.00) in cash or Twenty-five Thousand Dollars ($25,000.00) in bonds approved and accepted by the city, conditioned that the grantees will begin the operation of the buses in accordance with the provisions of said franchise, privilege and right, and at the time therein specified. It is contemplated between the parties that should there be a failure on the part of the grantees to begin operations at the time stipulated, grantor will sustain a substantial loss, and it is agreed between the parties that the principal sum of this bond is a fair and reasonable estimate of such loss and that such amount shall constitute liquidated damages and shall not be construed as a penalty.

"Section 11. If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason held to be unconstitutional or invalid, such decision shall not affect the validity of the remaining portions of this ordinance. The City Council hereby declares that it would have passed this ordinance and each valid section, subsection, sentence, clause and phrase thereof even if it had known that any one or more sections, subsections, sentences, clauses or phrases would be declared unconstitutional and invalid.

"Section 12. This franchise, privilege or right shall become effective and be binding upon the grantees and the City of Fort Worth after its acceptance and publication as provided by the charter of the City of Fort Worth.

"Passed and approved this 13th day of July, A.D. 1938."

■ It is a matter of public record, in this court, of which we take judicial notice, that a recall election had been duly called for July 23rd, 1938, for the purpose of permitting the qualified electors of the City of Fort Worth to determine at such election whether or not they desired to recall certain members of the then existing City Council and replace them by Councilmen then and there to be voted upon. It is a matter of public record that such Councilmen were, at such election, recalled and removed from office—there being six of the then acting Councilmen out of nine so recalled. These are some of the circumstances under which said Ordinance No. 2002 was passed ten days before such recall election.

In September, 1938, and before appellants, Joseph Eldridge and C. E. Mitchell, had begun to attempt operating under such ordinance and authority, appellee, Fort Worth Transit Company, brought suit in the 96th District Court of Tarrant County, against said City, its Mayor and Councilmen and other proper officers, and against said Eldridge and Mitchell, attacking said ordinance and its validity and praying for an injunction

prohibiting said City and its officers from attempting to enforce such ordinance and prohibiting Mitchell and Eldridge from attempting to operate under the same, in competition with complainant, and from thus injuring and destroying complainant's vested rights.

After a hearing before the trial court, such court made the following findings of fact and conclusions of law, and rendered judgment for complainant, "Transit Company." From such judgment Eldridge and Mitchell have appealed.

"Findings of Fact.

"The Court finds:

"1. That plaintiff, Fort Worth Transit Company, at all of the times of the actions complained of in this suit and at the time of the institution of this suit, was the owner of and operated under a valid charter and franchise and owned and was vested with a valid, subsisting franchise right to operate over and upon the streets of the City of Fort Worth a street railway system, and to operate motor buses in connection therewith for the carriage of passengers for hire, and became since the institution of this suit further empowered by the City of Fort Worth to substitute motor buses entirely for its street railway operations.

"In this connection the court further finds that plaintiff was duly incorporated by charter granted June 8th, 1874, for a period of ninety-nine years under the laws of this State for the purpose and with the power among others 'to erect, build, construct, operate and maintain its street railway on any or all of the principal streets of the City of Fort Worth for the transportation of freight and passengers and to collect pay therefor.

"Immediately thereafter and on July 15th, 1874, the then governing body of the City of Fort Worth granted plaintiff a franchise to carry out the purposes as set forth in said charter, as shown by Ordinance No. .60 in evidence in this case, and said franchise having been duly accepted by plaintiff, plaintiff began and constructed a street railway system in said city. By numerous ordinances thereafter from time to time duly passed said plaintiff was granted by said City further franchise rights and extensions authorizing plaintiff to extend its street railway service over and upon various other streets of the City of Fort Worth.

"Thereafter, said system having progressed from the early mule-drawn cars to the substitution of electric railway cars, and the Legislature in 1923 by the Acts of the Second Called Session, page 97, of that year (Article 6548) having authorized corporations such as plaintiff, upon the consent of the city, to meet the further needs of progress by operating motor buses or trackless vehicles in connection with presently operated street railway systems, such consent was given by defendant City to plaintiff by the enactment of Ordinance No. 1125, in evidence in this case. Following the passage of this ordinance, plaintiff substituted for some of its previously operated electric street car lines motor bus service. Defendant City of Fort Worth, its City Council and officers, had notice of and requested and authorized such substitutions by the plaintiff upon each of such motor bus routes, and subsequently ratified same.

"In the year 1933, by the Acts of the 43rd Legislature, (page 48, Chapter 22, Article 6548 as amended), corporations such as plaintiff were further authorized, with the consent of the governing body of the city, to substitute for its street railways motor buses in whole or in part, and to maintain and operate motor buses on the streets of such city for the carriage of passengers for hire. Thereafter the governing body of the defendant City consented for the plaintiff to substitute motor buses in whole for its street railway operation, as shown by Ordinance No. 2012, in evidence in this case, and such all-motor bus service and substitution it appears will be begun by the existing company by January 1st, 1939, and thereafter promptly installed.

"The routes upon which plaintiff was operating at the times mentioned herein are more fully set forth in detail in plaintiff's petition and correctly depicted upon a map attached thereto, which was offered as an exhibit in this case.

"Plaintiff at the time of the actions of the defendants complained of in this suit, and at the time of the institution of this suit, had a vested right and justiciable interest in the matters and controversy presented by its petition, and was entitled to maintain this suit; and defendants Eldridge and Mitchell have conceded in open court such right.

"2. The City of Fort Worth is a municipal corporation operating under a charter duly adopted on December 11th, 1924, pursuant to the Home Rule Amendment of the Texas Constitution and its enabling act. Individual defendants other than Eldridge and Mitchell compose the duly elected City Council of said City, its Mayor, City Attorney, City Manager and City Secretary.

"3. At all of the times mentioned herein and at the time of the passage of the ordinance complained of and the proceedings had with respect thereto, and at all times subsequent thereto, plaintiff was a solvent, going concern and an experienced operator of the transportation system in the City of Fort Worth, furnishing a city wide service, the existence and continuation of such a system being necessary to meet the necessity and convenience of the public in such City. Plaintiff was operating more than twenty distinct lines, including street cars and motor bus lines, within said City, as more particularly described and correctly shown in the routes set forth in plaintiff's petition and in the exhibit attached thereto, offered in evidence in this case, and which service constituted a complete, city-wide service and was dependable and adequate and sufficient to meet and serve the requirements and needs of the public for transportation.

"Plaintiff at all times had met and complied with all requirements for reasonable extensions and additional service, which was necessary or requested by the city of Fort Worth, and was ready, able and willing to afford any further service which might be reasonably demanded or requested of it by said City. The allegations contained in plaintiff's petition with respect to its routes, schedules, equipment, trained personnel and with respect to the sufficiency, adequacy, completeness and safety of its service are found to be true.

"The fare being charged by plaintiff was in excess of 5¢ and is more particularly set out in plaintiff's petition. No ordinance passed by the City of Fort Worth requiring the reduction of such rates, and no hearing was ordered to consider the enactment of such an ordinance. Prior to the City election in 1937 the Supervisor of Public Utilities for the City of Fort Worth made an examination and written report of a study made by him at the direction of the City Council as to the practicability of a 5¢ fare under an all bus operation in the City of Fort Worth, which report, after the election in 1937, was completed and furnished the Utilities Committee of the City Council and reflected that a 5¢ fare, after giving due allowance for increased patronage, would be non-compensatory and reflected a large annual loss upon such an operation.

"4. The City Charter of the City of Fort Worth, adopted on December 11th, 1924, and then and since at all times in full force and effect, provided by Chapter XXVII:

"Section 1. Power of City Council to Fix and Regulate the Rates, Tolls and Charges of All Public Utilities in the City. The City Council shall have the power by ordinance to fix and regulate the price of water, gas, electric lights, electric power and steam heat, and to regulate and fix the fares, tolls and charges of local telephone service and charge of street railways and of all public buses, carriages, hacks and vehicles of every kind, whether transporting passengers, freight or baggage, and generally to fix and regulate the rates, tolls and charges of all public utilities of every kind operating within the corporate limits of the City of Fort Worth.

"Section 2. Franchises—Vote—Regulation—Purchase by City—Term of Franchise.—The City Council of the City of Fort Worth shall not grant to any person or corporation a franchise, or extend the life of any existing franchise beyond the term originally fixed for its termination by the ordinance granting the same, for the use or control or distribution of any public utility, such as gas, water, electric light works, street railways, conduit system for electric lights, telephone or telegraph lines, and all other public utilities, whether similar or otherwise to these mentioned (subject to the exceptions set out in section three of this Chapter), unless the proposed ordinance granting such franchise, or the extension thereof, shall first have been submitted to a vote of the qualified voters of said City of Fort Worth, at either a general election or a special election called therefor, and until the same shall have been approved by a majority of the electors of said City voting at such election. All franchises shall be granted upon condition, and the same shall be a part of the franchise grant, that the City Council of the City of Fort Worth shall have the right to fix and regulate the price for the service

to be performed thereunder; and upon the further condition that the City shall have the right to purchase the property operated thereunder at any time after ten years subsequent to such grant, at the actual replacement value of said property, less depreciation; the replacement value to be determined, in case of disagreement between the City and the owner of the property, by arbitration as provided by the statutes of the State of Texas.

"The City Council shall have the power to compel all persons, firms or corporations operating any public utility in this City, whether operating under existing franchises, or franchises that may be hereafter granted, to extend their service, lines, pipes, etc., if the person to be benefited by such extension will pay the costs thereof, or if it can be shown that the revenues resulting from such extension will, within a reasonable time after same is made, pay a reasonable return on the investment, after making the customary allowance for depreciation. No franchise for a longer period than twenty-five years shall ever be granted or given by the City of Fort Worth.

"Section 5. Franchises and Privileges— Definition of as Applied to Public Streets and Highways—Power of Council to Regulate.—The right to use the public streets, highways, alleys and thoroughfares of this City, which necessitates the digging up, or displacement thereof, for the installation of equipment, appliances or appurtenances, either on, above or below the surface of the same, to make the intended use thereof practicable, shall be deemed and considered 'a franchise', granting of which shall be governed and controlled in the manner herein provided.

"The use of the said public streets, highways, alleys and thoroughfares of this City, which does not require the digging up or similar interference with said streets, alleys or highways for the installation of equipment, appliances or appurtenances, to make the intended use possible, shall be treated and considered as 'a privilege' subject to the control and disposition of the City Council, and such privilege over and upon the said public streets, alleys, highways and thoroughfares of the City shall not be granted to any person or corporation excepting when public necessity and convenience may require such use and when given by ordinance passed by a two-thirds vote of the City Council.

"The only hearing ever had upon which Ordinance No. 2002 must rest was held by the City Council of the City of Fort Worth on August 5th, 1937. This hearing was called upon written notice, which is in evidence in this case, issued to plaintiff and defendants Eldridge and Mitchell reciting it to be for the purpose of determining whether or not public convenience and necessity required the granting of a privilege for the furnishing of additional transportation service within the City of Fort Worth. At such hearing both plaintiff and defendants Eldridge and Mitchell appeared, and a stenographic record was kept of such proceedings and appears in evidence in this case and fully reflects all that occurred at said hearing.

"Such hearing was neither called nor conducted as a rate case. The evidence of plaintiff at such hearing was undisputed as to the service and operation of the existing transportation system, as before set out in these findings, and showed without dispute that the service rendered by plaintiff was an adequate city-wide service, with full equipment, personnel and schedules, and that said existing company was ready, able and willing to furnish any additional service which might be necessary or reasonably required by both or either street railway or motor bus transportation; that plaintiff's equipment was ample and sufficiently modern, safe, convenient and comfortable, and that if any further service should be authorized by the City Council or instituted by defendants Eldridge and Mitchell that same would be a duplication of the presently existing service of plaintiff.

"No evidence was offered showing that the fares being charged by the plaintiff as the existing company were excessive or unreasonable in the City of Fort Worth. Plaintiff was denied the right to cross-examine the defendants Eldridge and Mitchell with respect to their application or financial ability. The evidence offered at such hearing did not show or establish that the public convenience and necessity authorized or required the granting of the application of defendants to institute additional service in the City of Fort Worth in duplication of the existing transportation system.

"5. On August 9th, 1937, without more, the City Council made the following finding, which affords the sole predicate shown by the records of said City for the subsequent enactment of the ordinance attacked:

"After a full and complete discussion, City Councilman Hull moved that the City Council determine that there was a necessity and convenience in the City of Fort Worth for a 5¢ bus service. This motion was seconded by Councilman Martin and was adopted by the following votes: Aye: Mayor Hammond, Councilmen Eagle, Harrell, Elder, Hooper, Hull, Burton, Rumph and Seaman. Nay: None.

"Without any other hearing on the subject, the City Council thereafter passed Ordinances 1998 and 2001, which were identical with Ordinance No. 2002, attacked in this suit, except for provisions relating to publication. Ordinance 1998 and 2001 never became effective, but Ordinance 2002 was enacted on July 13th, 1938, and was thereafter duly and regularly published, and became effective upon completion of publication.

"6. Ordinance 2002 was passed without submitting the same to a referendum and purported on its face to grant a franchise for a period of twenty-five years to defendants Joseph Eldridge and C. E. Mitchell. Such franchise was granted upon an operation for the first year which duplicated substantially and for all practical purposes routes then presently operated and adequately served by plaintiff, Fort Worth Transit Company. The duplicated service mentioned fell substantially along routes over which the existing company was transporting passengers by motor bus. The duplicated operation authorized during the first twelve months fell along the lines which were yielding to the existing company forty-six per cent of its gross revenue, and allowed defendants to compete along lines constituting what may be correctly described as the 'cream' of the existing company's business without requiring of defendants during such period that any service be offered to other sections of the City or that it be required to haul passengers from the 'lean' areas. The duplicate operation authorized to defendants constituted, generally speaking, two principal lines at right angles across the City: (1) from Arlington Heights to Riverside and (2) From Diamond Hill by way of South Side to Polytechnic.

"By the terms of the ordinance any additional operation beyond that required for the first year was conditional and would never become a requirement if the existing company should be forced to a 5¢ fare in what is termed the 'B' area, consisting of more sparsely settled areas and long hauls.

"The ordinance by the provisions of Section 5 attempted to enter into a contract with the defendants to destroy competition in that the City would pass and enforce ordinances operating against plaintiff as the existing company to prohibit such existing company from operating over the routes upon which the defendants should install motor buses. By the terms of this attempted contract between the City and the defendants this agreement extended both to the routes prescribed for the first year's operation and subsequent operation as well.

"By section 4 of the ordinance the City attempted to barter away its control over the fares to be charged by defendants for a period of twenty-five years providing they did not exceed 5¢.

"7. That the finding of August 9th, 1937, was arbitrary and capricious and without reasonable basis of fact and was made without proper notice or hearing with respect to such matter.

"That Ordinance 2002 and the action of the City Council of the City of Fort Worth in enacting same was arbitrary, capricious, unreasonable and unjust. That Ordinance 2002 was enacted without substantial basis of fact and without evidence establishing that the public convenience and necessity required or authorized its enactment.

"That the provisions of Ordinance 2002 are unreasonable and unjust and operate to unduly oppress the plaintiff operating the existing transportation system; that the evidence offered at the only hearing ever conducted on August 5th, 1937, wholly fails to support the subsequent action taken by the City Council; and that under all the facts and circumstances bearing on the reasonableness of such ordinance and its enactment, the attempt to grant a franchise for twenty-five years to defendants without submitting same to referendum and/or the granting of a privilege without reserving same to the continuing control and disposition of the City Council as provided in Section 5, Chapter XXVII of the Charter; the further provision which bartered away the continuing right and duty of the City Council for a period of twenty-five years with respect to fare; the agreement with defendants to eliminate competition over routes to be operated by defendants and to pass ordinances prohibiting the existing company from operating over such routes; the authority granted to operate for one year over the selected, best lines of the existing company, and considering the other findings pre-

viously made, it appears and the court finds that the enactment of this ordinance was arbitrary, unreasonable and unjust, both in its purpose and effect.

"The Court finds that the only concern of the City Council in passing such ordinance was to compel a 5¢ fare without a hearing and the enactment of a rate ordinance, and to punish the existing company by the several provisions of the ordinance noted. That the ordinance was passed under the guise of a regulatory measure when its true purpose and effect was something else, as stated.

"The court finds that under the evidence in this case the installation and operation of a duplicated service for the first year provided in said ordinance over the selected, best routes in the City would be destructive of the continuation of a city-wide service and would impair or destroy the ability of the existing company to furnish service to the 'B' area described in such ordinance, with corresponding injury to the traveling public, and that such facts were apparent to the City Council from the evidence adduced before it on August 5th, 1937, considered in conjunction with the provisions of Ordinance 2002.

"8. That the evidence before the City Council prior to the enactment of Ordinance 2002 and the evidence before this Court did not show that Eldridge and Mitchell had or have the financial ability to provide, institute and operate with any degree of permanency the transportation service authorized by the ordinance in question; nor did the evidence show any sufficient familiarity or knowledge of the existing transportation problems in this city or of the service being afforded by the existing transportation system.

"The evidence before this court of operations of Eldridge and Mitchell in Texarkana and elsewhere is insufficient to establish an operation comparable to the one proposed. The figures offered by the witness Eldridge on the stand reflected no substantial outline of operation either as to expected income, expenses or number of employees proposed or wages to be paid, but on the other hand the evidence of such defendants showed that the success and continuation of their proposed operation depended entirely upon their ability to carry 15,000,000 passengers per year, which is more than 2,000,000 per year more than the present city-wide operation has ever carried. Further admission by the witness Eldridge that if the existing transportation system continued to operate with an estimated cutting in half of the number of passengers proposed to be carried by him, coupled with his testimony that his expenses would thereupon be also cut in half, showed a gross lack of understanding of transportation problems in this city, and further impels the finding of the unreliability and temporary character of the partial service offered.

"The refusal of the right to cross examination at the hearing of August 5th prevented the further development of the factors of the permanency and adequacy of the service offered as an element of convenience and necessity.

"9. That the plaintiff will sustain damage and injury to an extent of more than the minimum jurisdictional amount of this court in the event the injunction be not granted, and the amount of such damage is sufficiently difficult of ascertainment to authorize the granting of the injunctive relief prayed for.

"10. That the defendants Eldridge and Mitchell, unless restrained by this court, are threatening to and will undertake to begin the operation of a partial bus service as contemplated by the ordinance in question; and the defendant City of Fort Worth and the officers and council members, who are defendants here, will permit such operation unless restrained by this court, and will seek to enforce against the plaintiff the provisions of said Ordinance 2002.

"11. The publication of Ordinance 2002 was completed with the last publication thereof on August 5th, 1938, and the defendant Mitchell and Eldridge did not accept said ordinance until August 17th, 1938.

"12. That the purpose and effect and the terms of Ordinance 2002 are discriminatory against plaintiff as the operator of the existing transportation system, and that such ordinance by and through the operation of Section 5 and other provisions therein constitutes an illegal attempt on the part of the City with defendants Eldridge and Mitchell to contract to pass and enforce ordinances regulating other motor vehicles for hire, and such provisions are aimed at the plaintiff and are not subject to contract. That the further provisions agreeing to impose regulations on other companies engaged in the business of handling mass transportation are also aimed at the plaintiff and are not the subject of contract and constitute an agreement to pass ordinances and regulations with respect to the plaintiff as to fare,

wages and hours, insurance and other matters which are not the subject of contract; and as further evidencing such purpose and knowledge of the illegality thereof at the time of its passage, it is provided that if such regulations are not imposed on plaintiff, then the defendants Eldridge and Mitchell shall be relieved of compliance with the terms of the contract made.

"That the said City by the terms, scheme and subterfuge of such ordinance has attempted to bargain with the defendants and enter into an illegal contract designed to unduly and unreasonably interfere with the operation of the existing transportation system by plaintiff and to impair and contract away the freedom and duty of the City Council with respect to regulatory measures and with the purpose and effect of injuring and damaging the rights and property of the plaintiff, in violation of the constitutional protection to which same are entitled.

"That the plan, purpose, scheme and discriminatory nature of the provisions of Ordinance 2002 are part of a single plan and purpose, and the provisions of such ordinance in carrying same into effect are so interrelated as to be inseparable, and the entire purpose and plan of such ordinance as hereinabove found is single and cannot be sustained in whole or in part.

"Conclusions of Law.

"The Court concludes:

"1. That the findings hereinabove set out in so far as they embody conclusions of law are here reiterated as fully as if repeated herein, and that under the Findings of Fact heretofore made the law is for the plaintiff and against the defendants that the injunction as prayed for should issue.

"2. The plaintiff is entitled to maintain this suit and to injunctive relief and has justiciable right to the matters and things in this controversy.

"3. The amount involved is in excess of $1,000.00 and the damage and injury which will be sustained by the plaintiff if this injunction be denied would be difficult, if not impossible, of ascertainment as to the extent thereof.

"4. Plaintiff has a valid franchise right and vested interest which, though not exclusive, it is entitled to protect against illegal competition.

"5. Ordinance No. 2002 is invalid and should be enjoined because not the result of proper legislative consideration and not

supported by substantial evidence and because its purpose and effect is unreasonable, unjust, arbitrary and capricious, and the operation and effect of such ordinance is unduly oppressive against the rights of the existing carrier, and while passed under the guise of a regulatory measure has a different and illegal purpose and effect.

"6. Such ordinance was passed without a proper showing or any substantial evidence to show that the public convenience and necessity required or authorized the additional service proposed and was contrary to the requirement of public convenience and necessity that a continued adequate, permanent city-wide service should be maintained in this city. The convenience of a lower fare, however desirable or politically expedient, did not afford a sufficient support for the action taken nor eliminate from consideration other factors necessary to support a valid finding of public convenience and necessity for an additional system and the fact of necessity was not established.

"7. Ordinance No. 2002, both as to its purpose and terms, was enacted in violation of the provisions of Chapter XXVII of the City Charter of the City of Fort Worth, and its provisions are so interrelated, interwoven and inseparable as that the ordinance must fail as a whole.

"(Signed) A. J. Power,
"Judge 96th District Court."

Appellants' assignments of error are as follows:

"First Assignment of Error. The trial court erred in granting the plaintiff an injunction restraining these defendants from entering upon the operation of motor bus lines on the streets of Fort Worth pursuant to the provision of a valid franchise granted by said City.

"Second Assignment of Error. The trial court erred in overruling the general exceptions of the defendants, Mitchell and Eldridge, in that the petition as a whole seeks judicial review of an act of the City Council of the City of Fort Worth, legislative in character.

"Third Assignment of Error. The trial court erred in finding, in effect, that Ordinance 2002 of the City of Fort Worth, granting the franchise in question, was arbitrary and capricious.

"Fourth Assignment of Error. The trial court erred in finding that the determination by the City Council, on August 9th,

1937, of the existence of a necessity and convenience for such a franchise as the one in suit was arbitrary and capricious.

"Fifth Assignment of Error.. The trial court erred, in attempting to pass upon the question as to whether or not the act of granting the franchise in question was arbitrary and capricious, in assuming that the City Council could only consider evidence adduced at a formal hearing called for the consideration of the question of convenience and necessity.

"Sixth Assignment of Error. The trial court erred, in attempting to determine whether the act of the Council was arbitrary and capricious, in hearing and considering, as a basis for affirmative findings on this issue, any evidence other than the record before the City Council.

"Seventh Assignment of Error. The trial court erred in finding, if he did find, or assuming, if he did assume, that the evidence offered at the formal hearing held by the City Council for the purpose of consideration of the question of public convenience and necessity was insufficient to support a finding of convenience and necessity.

"Eighth Assignment of Error. The trial court erred in finding that there was any competent evidence to establish that the finding by the City Council of convenience and necessity was arbitrary and capricious.

"Ninth Assignment of Error. The trial court erred in enjoining operations by the defendants under their franchise, in the absence of a finding that the action of the City Council in determining the existence of public convenience and necessity was fraudulent."

Appellants present four "propositions" or points and assert that the first proposition is germane to assignments of error 1, 2, 3, 4, and 9, the second is germane to assignment 6, the third to assignment 5, and the fourth does not attempt to state to what same is germane.

■ There is but one general statement in the brief and it is asserted to be in support of all of the said assignments of error and all of the propositions. We do not understand that such is a proper way to brief a case, but our Supreme Court has made such broad rulings concerning the consideration of briefs that we have copied all the assignments of error and all of the propositions. We do not want to do violence to appellants' rights, or to any of them.

Turning to the "Argument" in appellants' brief, we find the following contentions:

"This is a case where the validity of an ordinance is attacked. The attack on it is necessarily based on the theory that the act of the Council in granting it was predicated upon a fraudulent finding that the franchise was in the public interest. The proceeding in the court then was or should have been directed to that issue. Whether the franchise was in fact in the public interest, was not under investigation, because such a question is for legislative and not judicial determination. In other words, the suit constituted an attempt to appeal from the Council on the ground of error committed by the Council upon the information before the Council. While the trial court does not seem to have fully understood this, as appears from the fact that he opened the floodgates to a great mass of testimony relative to the wisdom of the franchise, and made, or at least signed, a document purporting to be his findings of fact, clearly dependent upon testimony offered before him, we think we can safely assume in this court that such testimony was wholly immaterial except as it reflects evidence presented to the Council.

"In other words, plaintiff obtained, but was not entitled to, a trial de novo, on the question of the fact of public convenience and necessity of the franchise. * * * To put it mildly, the burden was upon plaintiff to establish that evidence before the Council showed conclusively that the public convenience and necessity would not be served by the franchise. We think, of course, that the burden is even greater, but in any event, it cannot be contended that the court's findings of fact must be assumed to be correct if supported by any substantial evidence before it. This, however, being the heart of the case, we pretermit discussion of this phase of the case until we finish the stripping process. * * This, we think, brings us down to the real issues. (a) Did the plaintiff allege facts showing that the City Council's finding that the granting of the franchise was in the public interest was fraudulent, and (b) Did the evidence establish such facts? * * * We repeat the question to be determined by the Council: 'Is it for the benefit of the people of Fort Worth to

'have an all-bus franchise with a five cent fare?' And now repeat the question, and the only question, that could be submitted to the court: 'Was the finding of the Council that it would be to the advantage of the people of Fort Worth to have an all-bus franchise with a five cent fare fraudulent?' This being the question, and the only question, that the court could consider, we now examine the plaintiffs' petition for the purpose of ascertaining whether it raises such a question."

The contention is then made that the petition is not sufficient because it does not allege what we shall term "actual or positive fraud". That is to say, fraud perpetrated with evil intent.

If we are able to understand appellants' contentions, they are: (1) That the plaintiff has no standing in court because it did not allege that the ordinance attacked was enacted by the City Council with a fraudulent intent; (2) that the district court, in the instant suit, had no right or authority to inquire into the facts and circumstances which were presented to the City Council and which formed the basis for a finding by such Council that a matter of public convenience and necessity exists that required the passage of the ordinance attacked, because the act in putting into effect such ordinance was a legislative act within the discretionary powers of the City Council.

In support of the first contention, appellants cite City of Farmersville v. Texas-Louisiana Power Co., Tex.Civ.App., 33 S.W.2d 272, 277; but we find the following language in the conclusions of the court on rehearing, and it seems directly opposed to appellants' contention: "If appellant's governing body exercised the rate-making power unlawfully, because of the want of the necessary population, and appellee was thereby injuriously affected in its property rights, such unauthorized and unlawful act of appellant's governing body would constitute legal fraud against appellee, notwithstanding the fact that such governing body honestly, but mistakenly, believed that the matter of the necessary population was determined by reference to the 1920 census report."

In such case the appellee attacked an ordinance that was passed by the governing body of said City, under and by virtue of the rights and privileges given such City through Article 1119 R.C.S.(Texas) 1925, Vernon's Ann.Civ.St. art. 1119, provided such city had then a population of 2000 inhabitants. The governing body made a finding that the City had the required number of inhabitants and, on such finding, enacted the ordinance attacked.

The practical effect of such ordinance is identical with the ordinance attacked in the instant suit.

When the "Farmersville" case finally reached the Supreme Court of Texas, Texas-Louisiana Power Co. et al. v. City of Farmersville, 67 S.W.2d 235, 240, the Supreme Court, speaking through Mr. Justice Sharp of the Commission of Appeals, said: "Since it appears that the population of the city of Farmersville is less than 2,000 and that all ordinances passed with respect to regulating the rates to be charged by the power company do not find support under the provisions of original article 1119, and it further appearing that the ordinances so passed cannot be sustained by virtue of the provisions of the amended article 1119 because of its invalidity, there is no ground left by virtue of the ordinances, upon which the city may sustain this suit against the power company."

Thus it appears that the "fact" on which the validity of the ordinances depended did not in truth exist. This was pleaded and evidence introduced in the trial court to show the non-existence of the necessary "fact".

■ We hold that whether or not "public necessity and convenience may require such use" of the streets, as the ordinance here under attack attempts to give, is a question of fact that must be established by competent and satisfactory evidence, in the light of the existing conditions.

If this conclusion of ours is not sound, then the City Council could arbitrarily and capriciously pass such an ordinance as is under discussion and wrongfully injure the vested property rights of any public service corporation, operating in the City of Fort Worth under a lawful franchise or privilege, by declaring that "public necessity and convenience" requires such action.

The City of Fort Worth, being one of the Home Rule Cities of Texas, derives its right to grant such a "privilege" as the said ordinance contemplates through the following provisions of its adopted charter: "The use of the said public streets, highways, alleys and thoroughfares of this City,

which does not require the digging up or similar interference with said streets, alleys or highways for the installation of equipment, appliances or appurtenances, to make the intended use possible, shall be treated and considered as 'a privilege' subject to the control and disposition of the City Council, and such privilege over and upon the said public streets, alleys, highways and thoroughfares of the City *shall not be granted to any person or corporation excepting when public necessity and convenience may require such use and when given by ordinance passed by a two-thirds vote of the City Council.*" Sec. 5, Chap. 27, Ft. Worth City Charter.

Under Chapter Thirteen (Vernon's Anno.Civ.Statutes, Title 28, Vol. 2), which contains the Legislative Acts passed after the Home Rule amendment to the State Constitution was adopted—Sec. 5, Article 11 Vernon's Ann.St.—we find that, among the enumerated powers delegated to these Home Rule Cities, Article 1175, Section 12, R.C.S., control of the public streets and highways is given such cities and likewise there is given the power, "to determine, fix and regulate the charges, fares or rates of any person, firm or corporation enjoying or that may enjoy the franchise or exercising any other public privilege in said city and to prescribe the kind of service to be furnished by such person, firm or corporation, and the manner in which it shall be rendered, and from time to time alter or change such rules, regulations and compensation * *. In order to ascertain all facts necessary for a proper understanding of what is or should be a reasonable rate or regulation, the governing authority shall have full power to inspect the books and compel the attendance of witnesses for such purpose."

Section 1, of said Chapter 27, of the Charter of the City of Fort Worth, provides for "the power by ordinance to fix and regulate the price of water, gas, electric lights, electric power and steam heat, and to regulate and fix the fares, tolls and charges of street railways and of all public busses, carriages, hacks and vehicles of every kind, whether transporting passengers, freight or baggage, and generally to fix and regulate the rates, tolls and charges of all public utilities of every kind operating within the corporate limits of the City of Fort Worth."

We do not believe that it will be seriously contended that a Home Rule City, operating under such a Charter as the charter of the City of Fort Worth—from which we have quoted—could, by an ordinance passed for the direct purpose, or by an ordinance which, when passed, indirectly effects such purpose, alter or change the existing rates, prices or fares being charged by any public service corporation, operating under an existing franchise, without a hearing first had in which the facts were developed that warranted the changing of such rates, prices or fares then existing.

A franchise, or privilege, is granted to a natural person, or a corporation, only on the theory that the grantee will render a needed service to the public and it goes without saying that it is not only contemplated but a known fact that the grantee will be compelled to spend or invest a large sum of money in equipping the grantee to enable it to adequately render the contemplated service.

When changes are made lowering the rates, prices or fares of existing, operating public service companies, it is essential that facts be adduced showing that the rates, prices or fares being charged are producing a larger return on the investment made by the public service company than is reasonably fair to the public being served. To put it another way, it must be shown that the net income from the existing rate, price or fare is so great that same can be reduced without impairing the efficiency of the service done the public and still provide a reasonable and fair return to the company rendering the service.

No effort was made by the governing body of the City of Fort Worth to adduce such facts.

It is our opinion that the purpose and effect of the ordinance under discussion was to compel appellee Transit Company to reduce its fares to five cents for adults and one-half such sum to children, by giving appellants the right to operate busses along the best paying routes over which appellee has been operating for years, at the reduced rates stated.

Against such competition appellee would of necessity be compelled to lower its rates, or sustain such a loss of patronage as that it could not continue in business.

The proof showed that the Transit Company cannot operate on the reduced rates without such injury to the wages of its employees and its own income as that its power to serve the public would come to a speedy end.

■ We hold that the City Council could not do indirectly that which it was authorized to do only directly and then only through proper and lawful procedure. To hold otherwise seems to us to be tantamount to saying that the property rights of a person or corporation may be taken away without "due process".

■ That appellee has a justiciable right to complain in such a suit as is here before us we do not doubt. Tugwell v. Eagle Pass Ferry Co., 74 Tex. 480, 9 S.W. 120; Fort Worth Gas Co. v. Latex Oil & Gas Co., Tex.Civ.App., 299 S.W. 705, writ refused; Texas Motor Coaches v. Railroad Commission, Tex.Civ.App., 41 S. W.2d 1074.

■ Among other findings, the trial court found that the evidence adduced before the City Council "did not show or establish that the public convenience and necessity authorized or required the granting of the application of defendants to institute additional service in the City of Fort Worth in duplication of the existing transportation system."

The facts adduced before the City Council are insufficient to support a finding of such public necessity and convenience. The trial court's findings are supported by the evidence and cannot be successfully challenged.

■ Vol. 67 A.L.R. page 957 contains the following statement of the law: "The general rule is that a certificate may not be granted where there is existing service in operation over the route applied for unless the service is inadequate or additional service would benefit the general public or unless the existing carrier has been given an opportunity to furnish such additional service as may be required."

(The Charter of the City gives authority to the governing body of the City to compel any public service company to extend its service, when there is a reasonable demand therefor.)

Under the pronouncement found in 67 A.L.R. there are cited many authorities from Arkansas, Illinois, Kentucky, Maine, Michigan, Montana, New Jersey, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Utah, Virginia, Washington and West Virginia. See Chicago Rys. Co. et al. v. Commerce Commission ex rel. Chicago Motor Coach Co., 336 Ill. 51, 167 N.E. 840, 67 A.L.R. at pages 938-966.

The transportation company, affected by the ruling of the Commerce Commission, had introduced evidence showing the adequacy of its service and of its ability and willingness to furnish any additional service which might be required to meet the transportation needs, and the opinion, in discussing these facts, presented to the Commission, declares: "In spite of this evidence and of the statements of the appellants of the manner in which additional facilities could be provided and of their ability and willingness to furnish any additional facilities which might be required to meet the transportation needs, the commission proceeded to give its certificate of public convenience and necessity. This action was not reasonable under the circumstances. The commission is not justified in granting a certificate of convenience and necessity to a competing line until the utility in the field has had an opportunity to demonstrate the truth of its statement and to give the required service."

■ It thus appears that the granting of a certificate of public necessity and convenience by any governing body, vested with such authority, in such a situation as we find in the instant suit, is not a matter merely within the discretion of the governing body, but is a matter that must be determined from the facts then existing.

In Shupee v. Railroad Commission of Texas, 123 Tex. 521, 73 S.W.2d 505, 508, the Supreme Court said: "The court cannot substitute its judgment for that of the commission, unless it be shown that said judgment of the commission was without foundation in fact, or was unreasonable or arbitrary."

This pronouncement seems to be the very gist of the law. We cannot conceive how it could be otherwise.

If the judgment and finding by the City Council, in the case at bar, was rendered without foundation in fact, and the trial court so found, and if such judgment and finding was unreasonable, and the trial court so found, and if such judgment and finding was arbitrary, and the trial court

so found, then the judgment of the trial court should be affirmed.

The voluminous statement that we felt is necessary to a proper understanding of this case is altogether too long, but we are constrained to call attention, especially, to some parts of the record.

The minutes of the City Council, which disclose the hearing and finding of the Council on the matter of a public necessity and convenience then under consideration, disclosed that it was "moved that the City Council determine that there was a necessity and convenience in the City of Fort Worth for a five cent (5¢) bus service," and that such motion carried.

We do not believe that any such finding can be construed as a finding that a public necessity and convenience exists which requires a bus service in the City of Fort Worth, other than and in addition to the service then being rendered by the company operating under a vested right and franchise.

The preamble to the ordinance, which followed, and without which the finding would be nothing, recites: "Whereas, under the provisions of Section 5, Chapter 27, of the Charter of the City of Fort Worth, and after a hearing duly and regularly held, the City Council finds that a necessity and convenience exists for the granting of a privilege to some reliable person, firm or corporation to operate motor buses for hire on the streets of the City of Fort Worth at rates not to exceed five cents (5¢) for adult persons and half-fare for children of twelve (12) years or less"; etc.

The language used in the preamble sustains our views. The ordinance does not recite that the City Council has found that a public necessity and convenience exists which requires a bus service in the City of Fort Worth, other than and in addition to the service then being rendered by the company operating under a vested right and franchise.

We cannot escape the conclusion that the ordinance under review is a rate making act.

We would not presume to say that such an ordinance could not be passed by the City Council at a time when no such service was being rendered to the citizens of the City, and at a time when the only person to be affected by the ordinance was the one to whom the privilege was then, for the first time, granted; but we do say that, in our opinion, where a company was then operating over the streets of the City, under ordinances and franchises then valid and existing, and rendering the service, contemplated by the new ordinance to be given to a competing person or company, and a rate is attempted to be fixed by such ordinance for the competing person or company lower than the rates then being charged by the company occupying the field, it is a necessary prerequisite that a rate hearing be had and the necessary facts adduced showing that a different rate should be charged for such public service.

We believe that the judgment of the trial court is sustained by many authorities, among them being: Seaboard Air Line R. Co. v. Wells, 100 Fla. 1631, 131 So. 777, Canton-East Liverpool Coach Co. v. Public Utilities Comm., 123 Ohio St. 127, 174 N.E. 244; West Suburban Transp. Co. v. Chicago & West Towns Ry. Co., 309 Ill. 87, 140 N.E. 56; Chicago Bus Co. v. Chicago Stage Co., 287 Ill. 320, 122 N.E. 477; Houston & T. C. R. Co. v. City of Dallas, 98 Tex. 396, 84 S.W. 648, 70 L.R. A. 850, citing Milliken v. City Council, 54 Tex. 388, 38 Am.Rep. 629, and Mills v. Missouri, K. & T. Railway, 94 Tex. 242, 247, 59 S.W. 874, 55 L.R.A. 497.

We have not discussed other questions presented by the record, believing that we have discussed such as demand an affirmance of the judgment of the trial court.

The judgment is affirmed